Dureee, Judge,
delivered the opinion of the court:
In this action plaintiff seeks $170,675.75 for damages alleged to have resulted from Government delays of plaintiff’s performance of a certain Government contract.
On June 12,1953, plaintiff submitted a bid, in response to an invitation to bid from the Office of the District Engineer, Philadelphia District, U.S. Army Corps of Engineers, for the manufacture of steel towers designed to support water tanks of three sizes. After a survey made by Army civilian inspectors to determine whether plaintiff was qualified to perform that work, on June 29, 1953, plaintiff was notified that its bid was accepted for 58 of the 10,500 gallon tank towers, at a unit cost of $1,042, and 244 of the 21,000 gallon tank towers at a unit cost of $2,126. Subsequently the number of larger towers under contract was reduced to 169. The total contract price was $419,730.
On July 1, 1953, plaintiff, by letter, acknowledged the notice of award of the contract. In addition to the acknowl- *236 edgement of the notice of award, that letter contained the following paragraph:
It is necessary that we have 6 additional sets of drawings and would appreciate receiving these as soon as possible. Wo might add that the one set covering the 21,000 gal. tanks received with your inquiry were very poor prints and were hardly legible.
Plaintiff alleges that Government delay in furnishing sufficiently legible drawings for the 21,000 gallon tank towers was a primary cause of the protraction of the period required to complete its performance of the contract from 262 days to 518 days, thus occasioning the additional costs for which plaintiff currently seeks damages.
Actually, it was only the illegibility of sheet number 2 of the drawings for the large tank towers that plaintiff contends caused the delays in production. Among other things this sheet contained the specifications for the materials required under the contract for fabrication of the towers. The alleged illegibility did not however prevent plaintiff from ordering the steel necessary for work on the contract on July 9, 1953. This order was subsequently revised on July 22, but only to accord with a reduction in the number of towers covered by the contract.
On July 15, 1953, plaintiff wrote to the Corps of Engineers in New York advising that office that “we found the following minor discrepancies and omissions in the drawings submitted to us.” The letter then enumerated specific defects and requested clarification accordingly. On July 30, 1953, plaintiff was advised by letter from the New York office of the Corps of Engineers that the clarifications proposed by plaintiff had been accepted in their entirety.
Again, in a letter dated August 20,1953, plaintiff reminded defendant that in its letter dated July 1, 1953, it had requested six copies of the drawings for both types of towers, and stated that it had received copies of the drawings only for the large towers. Plaintiff requested that the defendant look into the matter and send the other copies at the earliest moment. We deem it worthy of note that the letter acknowledges the receipt of copies of the drawings for the large towers and makes no reference to their alleged illegibility. *237 This is especially important inasmuch as it is the purported illegibility of the drawings for the large towers that plaintiff contends caused the delay in performance of the contract.
In a letter dated September 3, 1953, the Office of District Engineer, New York District, sent plaintiff new drawings to incorporate the changes that had been proposed earlier by plaintiff and accepted by defendant. Plaintiff did not have these drawings in its plant for more than a few days, however, inasmuch as they were recalled to Washington by the Government in order to make additional copies. The copies were not returned to plaintiff until sent by the Corps of Engineers with a letter dated January 6,1954.
We are not convinced that plaintiff has sustained its burden of proving actual delays directly attribuable to the events described above. Initially, the drawings were sufficiently clear for plaintiff to tender firm bids involving substantial sums of money on the contract. While this is certainly not dispositive, we believe it relevant to the matter before us. Moreover, the fact that plaintiff, in its letter of July 15,1953, evinced sufficient comprehension of the drawings to point out discrepancies and minor errors therein for the Government’s clarification, argues against its contention that the drawings were so illegible as to impede production. The Government’s letter of July 30, 1953, accepting plaintiff’s proposed clarification should have completed plaintiff’s coni’ prehension of the drawings. Were this not sufficient, the fact that plaintiff did receive clear drawings, revised to incorporate its proposed clarifications, under the Government’s covering letter of September 3, 1953, detracts further from plaintiff’s assertions regarding the causes of delay. While it is true that these clear, complete drawings were in plaintiff’s possession for only a few days, the fact that plaintiff had them for study at that time, to supplement the previous correspondence and earlier drawings, should have clarifiéd and completed its understanding of them. We find this interpretation of the fact buttressed by additional facts indicating that despite the alleged illegibility of the drawings, plaintiff was able to order steel for the contract only nine days after it acknowledged receipt of the notice of award; plaintiff had been able to commence work fabricating the steel when *238 it was delivered; and plaintiff had been able to fabricate a substantial portion of the components of the smaller towers and some of those for the larger towers by the end of 1953. We find damaging to plaintiff’s position the fact that it had been able to erect pre-production models of both the large and medium towers by November 10,1953, at which time the major portion of plaintiff’s order of steel for the contract had either just been delivered or remained undelivered. For these reasons we conclude that plaintiff’s performance was not delayed by the alleged illegibility of the drawings.
Plaintiff attempts an additional argument alleging delay due to its anticipation of possible revisions of the drawings to incorporate structural changes in the towers during the time that the drawings were in the Government’s possession. The bulk of the evidence on which this allegation of possible revision is based, is found in inter-office communications between the various engineers’ offices, which were not available to plaintiff until it gained access to these documents by recourse to discovery procedures at the time this case went to trial. Obviously, due to the chronological sequence, plaintiff cannot contend to have placed reliance on these communications during its performance of the contract inasmuch as it was unaware at that time of the existence of these interoffice communications. While the word “revision” does appear occasionally in the correspondence, we find that it was used to connote revisions of the original drawings to incorporate the clarifications suggested by plaintiff in its letter of July 15, 1953. Finally on this point, the contract contained a “Changes” clause whereby the Government would have been obligated to make equitable adjustment for any revisions of contract specifications initiated by the Government in the course of plaintiff’s performance. Plaintiff never received any stop order from the Government advising plaintiff to halt production pending changes. Plaintiff, if it did rely on any inference of possible revision of contract specifications, misplaced its reliance without sufficient cause, and is therefore in no position to hold the Government responsible for any delay so incurred. Moreover, while the alleged possibility of revisions would have been equally applicable to both the medium and large towers, the fear of such revisions *239 did not prevent plaintiff from fabricating most of the components for medium towers at an early date. For these reasons we conclude that plaintiff has not sustained its burden of proving delays attributable to the Government by virtue of the alleged possibility of the Government’s revision of the contract drawings.
An additional factor alleged by plaintiff to have contributed to the delay in its performance of the contract concerns the dunnage for the towers. The contract required plaintiff to supply wooden dunnage to be placed over the deck beams at the tops of the towers. The drawings, however, were silent as to whether holes were to be drilled in the deck beams to accommodate fastening devices for the dunnage. Consequently, between August and October 1958, a dispute arose between the parties as to whether the contract required plaintiff to provide devices to fasten the dunnage to the deck beams. After intermittent communication regarding the matter, in a letter dated January 6, 1954, the Government advised plaintiff that it had been determined that the contract did not require plaintiff to furnish devices to fasten the dunnage to the beams. Plaintiff alleges that the failure to resolve this matter delayed its performance further. Plaintiff did not, however, make attempts to secure dunnage until December 2,1953, although Government personnel had previously requested that the orders be placed. On January 7, 1954, Hilltop Lumber Company submitted a bid on the dunnage and on January 15, 1956, plaintiff advised the Government by letter of the type of lumber it proposed to use for dunnage. On January 25,1954, the Government objected to the type of lumber proposed by plaintiff as inadequate, and on February 1, 1954, plaintiff was advised by telephone of the type of dunnage required. On February 5, 1954, Hilltop Lumber Company revised its bid accordingly, and on February 15, 1954, plaintiff placed its order with Hilltop. Deliveries were made by Hilltop direct to the Government in 14 shipments between June 29,1954, and December 2, 1954. That the ordering of the dunnage in no way depended upon the resolution of the disagreement as to whether fastening devices were required by the contract is supported by the fact that plaintiff solicited bids therefor *240 beginning December 2, 1958, although the dispute was not resolved until January 6, 1954. The fact that plaintiff initially solicited bids on a type of lumber unacceptable to the Government under the contract was not due to any fault on the part of the Government. Furthermore, had it been determined that fastening devices were required under the contract, additional fabrication in the form of drilling holes in deck beams and dunnage would have been required on only half the deck beams. Subsequent to the receipt of the steel deck beams during November 1953 until the resolution of the dunnage fastening device issue on January 6, 1954, plaintiff had on hand considerable quantities of steel requiring fabrication that would have been unaffected by the problem. For these reasons we find that plaintiff has proven no delays attributable to the Government in consequence of the dunnage procurement problem and the dispute regarding fastening devices for the dunnage.
As an additional ground for recovery, plaintiff avers that the aforementioned delays, inter alia, caused the steel used in fabricating the towers to rust to an abnormal extent such as to require plaintiff to engage a subcontractor to remove the rust by sandblasting. Inasmuch as we have already concluded that plaintiff has failed to sustain its burden of proving that the delays in its performance were attributable to Government malfeasance or dereliction, our determination regarding this issue would appear foreordained. In addition, it should be noted that the bulk of the steel plaintiff ordered for use on the contract had been delivered by the end of November. The steel was stored outdoors, fully exposed to the weather for varying periods in an industrial area prior to fabrication and protective painting. While the steel was stored from early fall on outside, subject to winter’s adverse weather conditions, the record indicates that plaintiff did not even begin to receive protective paint to cover the steel until December 1953. While plaintiff had certain rust-removing facilities at its plant they were inadequate to remove the rust deposits on the steel, and the rust accumulations that appeared under some of the painted steel. Consequently, plaintiff was forced to subcontract the rust removal and painting operations to a company having more *241 efficient sandblasting and painting equipment. On the basis of the record before us, we conclude that plaintiff has not established that the additional expenses so incurred were caused by Government action.
As supporting its allegation of delays caused by the Government, plaintiff relies heavily on contract modifications dated February 24 and 25, 1954, and the surrounding correspondence and circumstances. The modifications provided that due to delays caused by the Government, the delivery dates under the contract would be extended and partial payment would be granted to plaintiff prior to the time of completion of work on the contract. While at first glance the reasons ascribed for the modifications appear seriously damaging to the Government’s position, we do not deem them dispositive. As the statements of the contracting officer they reflect directly on the mode of administration of the contract. Nevertheless, in this legal proceeding it is the record at the trial level that must determine the ultimate adjudication of the facts in issue. The record in this case indicates that the reasons ascribed by the contracting officer were based entirely on representations made by plaintiff. No investigation was undertaken by the Government to verify the validity of these representations prior to the modifications of the contract in plaintiff’s favor. The evidence in the entire record before us does not establish the validity of the representations made by plaintiff, upon which the contracting officer relied. While such action without prior investigation may be indicative of unwise contract administration, we do not deem it dispositive of the issues in the case. Similarly, we do not believe that findings so made by the contracting officer work an estoppel to prevent the Government from denying responsibility for the alleged delays. While the contracting officer’s findings are undoubtedly strong evidence supporting plaintiff’s position, we believe them to be rebuttable, and in fact find this evidence rebutted by the record in its entirety.
Plaintiff asserts several miscellaneous bases for recovery, but we do not find any of them compelling. In an action of this type, the burden is on plaintiff to establish by a preponderance of the admitted evidence the delays alleged to *242 have caused tbe damages sought and that these delays were directly attributable to some sort of wrongdoing or inaction on the part of the Government. We do not find evidence in the record sufficient to convince us that any specific period of delay was attributable to this sort of Government action. While the testimony indicates that plaintiff kept production records which would undoubtedly have been most enlightening regarding the matters at issue, such records were not produced by plaintiff at trial. In short, to accept plaintiff’s allegations, we would be required to draw a series of inferences that we do not believe are sufficiently established in the record of this case.
For the reasons stated, judgment will be entered for the defendant and the petition will be dismissed.
It is so ordered.
Laramure, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
Davis, Judge,
took no part in the consideration and decision of this case.
FINDINGS OE PACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a New York corporation with its headquarters and a small plant at Maspeth, Long Island, New York, and with branch plants at Baltimore, Maryland, and Benwood, West Yirginia. It has for many years been engaged in the business of manufacturing pipe railings, bridge railings and fabrication of structural steel forms. It had a contract during World War II for the manufacture of steel water towers for the Army Corps of Engineers which contract had been terminated in 1945 due to cessation of hostilities while the contract was still two-thirds uncompleted.
2. On June 5, 1953, the Office of the District Engineer, Philadelphia District, Corps of Engineers, Department of the Army, issued invitations to bid foir steel water tank towers for delivery, disassembled, within 262 days from notice of award. There were bids solicited for three sizes each 36 feet in height, as follows:
*243 No tanks are involved herein; only the towers to support the weight of tanks of those capacities filled with water are covered.
3. On June 12, 1953, the plaintiff submitted a bid on the entire quantity of each size desired at a unit price of $849 for the 4,000 gallon tank tower, $1042 for the 10,500 gallon tank tower, and $2126 for the 21,000 gallon tank tower. In the aggregate the total bid was about $1,600,000 with deliveries to be accomplished “as desired in Govt, schedule.” Deliveries were to be made at the above prices “F.O.B. Cars, Point of Origin.”
4. A survey was made by Army civilian inspectors to determine whether or not the plaintiff was qualified to perform the work. Thereafter, on June 29, 1953, the plaintiff was notified that its bid was accepted for 58 — 10,500 gallon tank towers, at a unit cost of $1042, total $60,436, and 244 — ■ 21,000 gallon tank towers, at a unit cost of $2126, total $518,744. This was a total contract price for towers of both sizes of $579,180, with delivery of the entire order to be performed by March 16,1954, the above prices to be f.o.b. cars, Benwood, Wheeling, West Virginia. In the notice of award the plaintiff was advised that the contracting officer’s representative for administration of the contract was the District Engineer, New York District. The inspection point was designated as the plaintiff’s plant at Benwood.
5. By the invitation to bid the plaintiff had been notified of the priority and allotment of controlled material available for the contract and by the notice of award, the same was certified to the plaintiff and no question was thereafter raised during performance in connection with the matter of priorities.
6. On July 1, 1953 the plaintiff acknowledged receipt of the notice of award which had been received the day before in the following terms:
*244 Corps op Engineers, United States Army,
121 North Broad Street, Philadelphia,, Pa.
Att: Lt. Col. J. I. Gurfein
Re: Contract No. DA-36-109-ENG-4827
Purchase Order No. 29-6083-27
Req. No. EP-562.2-53 & Amend. 1 & 2
Gentlemen: We wish to acknowledge receipt and thank you for Notice of Award covering 58 — 10,500 gal. Water Tank Towers and 244 — 21,000 gal. Water Tank Towers as covered by the above subject reference.
It is necessary that we have 6 additional sets of drawings and would appreciate receiving these as soon as possible. We might add that the one set covering the 21,000 gal. Tanks received with your inquiry were very poor prints and were hardly legible.
Very truly yours,
Vulcan Rail & Construction Co.
W. J. Wilson.
7. The specifications covering the production of the water tank towers here involved were Army specification 87-31 dated November 25, 1947, with Amendment No. 1 dated December 13, 1948. Size No. 2 related to the 10,500 gallon tower with drawings T.O. 21.19 sheets 1 and 2. For the 21,000 gallon tower the same specifications for size 3 and drawings T.O. 21.20 sheets 1 and 2 were applicable.
8. The shipping weight of the 10,500 gallon towers was 12,311 pounds each, and that of the 21,000 gallon towers was 23,428 pounds each. This was roughly six tons for the smaller and twelve tons for the larger towers. It should be noted that the towers were entirely of steel except for what is described as the dunnage, being the timbers at the top on which the water tank would rest when installed in the field.
9. The contract as entered into by the Government and Vulcan contained the following pertinent provisions:
2. Changes
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) Drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or pack *245 ing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
3. Extras
Except as otherwise provided in this contract, no payment for extras shall be made unless such extras and the price therefor have been authorized in writing by the Contracting Officer.
5. INSPECTION
(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance.
* * * $ *
(d) The inspection and test by the Government of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be discovered prior to final acceptance. Except as otherwise provided in this contract, final acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.
:|t % ‡ $
11. Default
(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:
*246 (i) if the Contractor fails to make deliveiy of the supplies or to perform the services within the time specified herein or any extension thereof; or
(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
(b) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet, the required delivery schedule.
* * * * *
12. Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
*247 10. The drawings for the 10,500 gallon tank towers were entirely legible and no question concerning their legibility was ever raised by the plaintiff. The same is true also as to sheet 1 of the drawings for the 21,000 gallon tank towers.
11. As to sheet 2 of the drawings for the 21,000 gallon tank tower, the plaintiff now protests that the drawings were not sufficiently legible to proceed with the work. It is true that the plaintiff requested more legible prints of this drawing. The drawing was sufficiently legible for the plaintiff to make a firm quotation on producing 244 of such towers at a total price exceeding $518,000 within 262 days, as well as an additional $1,000,000 of work on the other two sizes within the same time. It is found that the matter of legibility of drawings did not interfere with the production of towers by the plaintiff.
12. On July 9, 1953, the plaintiff ordered the steel components required by the subject contract from the United States Steel Corporation. The order called for the shipment of at least 25 percent of every size and length of the steel components during the months of September, October, and November, 1953, with the balance to be shipped in December 1953. The order comprised many items including beams, angles, plates, flats and rods making up a total weight of 5,702,318 pounds.
13. On July 15, 1953, the plaintiff wrote the Corps of Engineers in New York informing that office that “we have found the following minor discrepancies and omissions on the drawings submitted to us.” The letter went on to list certain specified defects in the drawings and requested review of the drawings. On July 30, 1953, the plaintiff was advised by a letter of that date from the New York office, Corps of Engineers, that all of the clarifications proposed in plaintiff’s letter of July 15, 1953 “* * * have been accepted in their entirety.” On July 22, 1953, the plaintiff wrote United States Steel Corporation that it had been advised of a partial termination of the contract and their order should be changed accordingly. The reduction in the steel required resulted in a revised order for 4,105,762 pounds. A no-cost settlement agreement for partial termination was subsequently entered into by the plaintiff and the Govern *248 ment on September 4, 1953, whereby the number of 21,000 gallon towers under the contract was reduced from 244 to 169 with a resulting agreed reduction in the contract price of $159,450 to a new total contract price of $419,730.
14.The United States Steel Corporation on August 19, 1953 telephoned plaintiff and provided the mill rolling schedule on plaintiff’s order as revised on July 22,1953. The schedule provided by weight the following production.

Month Weight in pounds

September 1953_ 499,813
October 1953_ 1, 509,795
November 1953_ 2, 044, 374
December 1953_ 51,780
Total_ 4,105,762
By type most of the plates, flats, rounds, and a few angles were scheduled for September. In October, medium beams, most of the angles and a few plates and flats were to be produced. In November the heavier beams predominated and in December the residual angles were scheduled. Plaintiff’s order was acknowledged by the United States Steel Corporation on August 25,1953.
15. By August 20, 1953, the plaintiff had been furnished complete sets of drawings for both sizes of towers. Plaintiff’s exhibits 7 and 8 show receipt by plaintiff of drawings for the smaller towers and the plaintiff’s letter of August 20,1953, without referring to legibility, states:
if: ijs ijc %
On July 1st we requested that you send us 6 sets of drawings covering both the 10,500 gallon and 21,000 gallon Water Tank Towers.
Since that time we have only received drawings for the 21,000 gallon Towers. We would appreciate your checking and getting these off to us as soon as possible.
sje Hí # ❖ ❖
16. On September 3, 1953, the Office of District Engineer New York District wrote to the plaintiff as follows:
% * * * Hi
Reference is made to your letter dated 15 July 1953 concerning discrepancies on Drawings T.O. 21.20 and *249 T.O. 21.19 covering units being procured under above order.
The proposed changes, except for corrections as noted on the Drawings with brown or green markings are approved.. The yellow markings indicate that the item as originally shown on the Drawings is approved as correct.
In addition, Item 3, on the list of changes submitted by your office is to be changed as follows:
“The Cap Plate shown at the lower left hand corner is to be marked C15A and the Angle C14A. The Cap Plate shown at the lower right hand comer is to be marked C15 and the Angle marked C14.”
Further, all previous instructions to the contrary notwithstanding, the utilization of dunnage in two sections is hereby approved, providing that the members are adequately spliced. Sketch SK-6710-1, shows two methods for splicing the dunnage. The bill of materials is to be changed to provide for the additional items required to make the preferred splice. In addition, Sketch SK-6710-1 contains details of a method for fastening the dunnage to the steel beams and a detail for securing the tank to the tower, which were not adequately shown in the original Drawings.
The above clarification and waivers are to apply to this contract only. [Italics supplied.]
Request for revised Drawings was submitted this day.
For the District Engineer :
* * * * *
17. The New York office of the Corps of Engineers also requested on September 3, 1953, that the Philadelphia office supply it with six copies of the corrected set of drawings supplied to plaintiff on the same day. This required that the Philadelphia Engineer obtain the single corrected set of drawings back from plaintiff which were then sent to the Chief of Engineers in Washington, D.C., for reproduction. As a result, the corrected drawings were initially in the hands of the plaintiff for only a short period of time in the early part of September 1953. However, the plaintiff’s plant at Benwood had a drafting room and it would not take a competent draftsman more than two days to draft a new drawing. There were also competent draftsmen and facilities at plaintiff’s Maspeth headquarters.
*250 18. The New York and Philadelphia Engineer offices maintained a strict follow-np system to obtain from the Chief Engineers the copies of the drawings as corrected which were requested on September 3,1953. This involved writing letters and on occasion telegraphing to attempt to obtain the copies of the drawings as soon as possible. On occasion strong language suggesting delays if the drawings were not furnished, was used in the interoffice communications to the Chief of Engineers in order to obtain faster action on the request for copies. The New York and Philadelphia Engineers felt that the language was justified as it was possible that a delay might occur and because there was a general, strictly enforced, office policy of following up on requests made. The drawings made by the Chief of Engineers office from the drawings originally submitted to the plaintiff on September 3,1953, were supplied to plaintiff by letter dated January 6, 1954. These drawings incorporated the corrections, errors, and omissions adverted to by the plaintiff previously on July 15, 1953, and which plaintiff had been informed were accepted in full on July 30, 1953, and September 3, 1953. In addition there was one other minor change. No major revision of the drawings for the towers required by the plaintiff’s contract was ever contemplated by the Corps of Engineers. The Chief of Engineers office did, however, contemplate a possible revision of the drawings to be used in future procurements of water towers in order to improve certain structural features. (See finding 16.)
19. Commencing August 28, 1953, the plaintiff began to receive steel shipments from United States Steel, the small shipment on that date containing some $767.36 worth of flats weighing some 14,080 pounds. Small quantities of angles and plates were received during September and October but ha November some 39 shipments were received between the 2nd and the 14th, these shipments containing mostly beams. Two shipments were received in December and the final shipment was received on January 22, 1954. There were 60 shipments in all with the following weight breakdown by month:
*251 Months steel received Weight in pounds
August 1953_ 14,080
September 1953_ — 346,678
October 1953_ 1,130, 867
November 1953_ 2,416,122
December 1953_ 119,909
January 1954_ 83, 547
Total_4,110, 383
A detailed day to day listing of steel shipments received showing date received, description and cost to plaintiff appears as Appendix 1.
20. As to receipt of steel at the site, the testimony on direct of Mr. Lawrence C. Jacobsen, who is now president of the plaintiff, shows some degree of delay and confusion on the part of the plaintiff. An excerpt quoted from transcript at Page 106 follows :
Q. Indicate, generally, what was done with this steel when it was received from the steel corporation ?
A. It was unloaded as quickly as possible.
Q. Then, what happened to it? When the steel was taken off the cars, where was it put ?
A. It was stored on a portion of this five acres that I mentioned before, because our yard space wasn’t large enough. It developed, I don’t recall which shipment it was, but we went down to the office, one day, and found 31 carloads of steel on our sidings, which was a horrible job. We didn’t know what to do with it; we had no space to store it; so we immediately contacted Wheeling Steel Corporation, and they authorized the use of a portion of the five acres. That, incidentally, tied us up for several weeks, inasmuch as unloading 31 cars of steel with these crane cars is a slow process.
Q. Did you personally observe that steel, as it was received?
A. Yes.
Q. You said the ma j ority of it ?
A. Well, that 31 cars — Mr. Pizzell happened to be in New York at that time.
Q. In what condition was this steel, as it was received ?
A. All new steel.
Q. All new steel ?
A. Yes.
21. Upon receipt of steel, it was stored outdoors not under cover.
*252 22. The fabrication of the steel by the plaintiff required several processes. Thus, the appropriate steel components had to be burned or sheared to size and appropriate holes punched or drilled. After fabrication the steel had to be cleaned and then painted. The plaintiff’s plant layout required that fabrication be accomplished indoors, while cleaning and painting were to be done outdoors.
23. The plaintiff commenced fabrication as soon as steel was received at its Benwood plant. Work was first commenced on the 58 — 10,500 gallon towers. The plaintiff, having previously prepared shop bills, or details of the drawings for use in the shop by the workmen, by November 10, 1953, was able to fabricate, and through a subcontractor, erect acceptable unpainted preproduction models of both the 10,500 gallon and the 21,000 gallon towers.
24. The plaintiff was required to furnish the bolts necessary for the erection of the towers and, accordingly, on November 23, 1953, placed an order for these bolts with the Bayonne Bolt Company, Bayonne, New Jersey. The bolts were to be packaged in the units required for each tower and were delivered in five partial shipments, one on December 21, 1953, two on January 27, 1954, one on February 23, 1954, and the final on June 25, 1954. The shipments on January 27, 1954, completed the bolts required for the 10,-500 gallon towers and the remaining shipments involved the 21,000 gallon towers.
25. As indicated in earlier findings, the United States Army specification concerning the fabrication of the towers in suit was No. 87-31, dated November 25, 1947. That specification provided in part as follows:
A-l. Specifications. — The following specifications, of the issue in effect on date of invitation for bids, form a part of this specification:
❖ $ ‡ $
A-lo. U.S. Army Specification, Nos. 3-192. Finishing, Treating, and Painting for Engineer Equipment.
❖ $ $ $ $
JAN-T-704, dated November 29, 1948 provide in part as follows:
This specification was approved by the Departments of the Army, the Navy, and the Air Force for use of *253 procurement services of the respective Departments, and supersedes the following specification:
U.S. Army
3-192
30 Oct. 1945
‡ ‡ ‡ ‡
Military specification MIL-T-704A, dated May 14, 1952, superseding JAN-T-'T04, dated November 29,1948, provided in part as follows:
3. Eequirements
3.1 Surface preparation.
3.1.1 Steel Surfaces.
3.1.1.1 Noneorrosion-resisting steels. — Surfaces of other than corrosion-resisting steels shall be prepared for painting by solvent or vapor degreasing if necessary to assure an oil-and-grease-free surface, and cleaning by commercial surface blasting (No. 2 commercial grade is acceptable) to remove all tight and loose mill scale, products of corrosion, dirt, casting sand, slag, or other foreign substances. Oil and grease contamination resulting from fabrication, machining or handling, subsequent to the cleaning described above, shall be removed by washing with mineral spirits conforming to Specification TT-T-291. Immediately following cleaning, surfaces shall be given a pretreatment coat conforming to Specification MIL-P-15328.
26. The plaintiff did not receive any paint it had ordered with which to paint the towers until after December 1, 1953. Prior to painting and after fabrication of the steel it was necessary to prepare the surface of the steel by some method to remove mill scale and rust. The plaintiff employed a method utilizing chipping hammers and then wire brushing by hand or power equipment to accomplish this surface preparation. The wire brushing method was permitted by the engineer inspectors at the plaintiff’s plant and plaintiff was never directed to use another cleaning method. The plaintiff’s surface preparation operation consisted of placing steel on steel work horses in the plant yard for cleaning. After the steel surface was cleaned by chipping and wire brushing it had to be painted within five hours. After painting it was necessary that the steel be moved to another area for air-drying so that the dust from the wire brushing operation would not affect the painted surface. The plain *254 tiff’s cleaning process was more costly and time-consuming than one employing surface blasting.
27. While there is testimony from the plaintiff’s president that the plaintiff maintained production records, none were produced at the trial. The failure to produce such records (not adequately explained) considerably weakens testimony as to the actual production based on recollection of witnesses.
28. According to a Corps of Engineers production status report of January 19,1954, the plaintiff on that date had 41 of the 10,500 gallon tank towers available. They were apparently completely fabricated, but it is not clear whether or not they had then been painted. This report shows further that the plaintiff had informed the inspector at the plant that the entire order of the 58 small towers would be completed by the end of January 1954, and that completion of the large towers would be accomplished at the rate of 10 per week starting February 1,1954.
29. By letter dated January 6, 1954, from the New York Office Corps of Engineers the plaintiff was supplied with clear copies of the drawings originally supplied on September 8, 1953. Also by the letter of January 6,1954, there was resolved a problem, which had its inception in August of 1953, relating to the fastening of dunnage to the steel deck beams of the towers.
As the plaintiff had been able to order the steel required by the contract only nine days after it acknowledged receipt of the notice of award; had been able to commence work as soon as the steel was received; had been able to erect pre-production models of the towers on November 10,1953; and had been able to fabricate a substantial portion of the component parts of the small towers, and some of those for the large towers by the end of 1953, its production was not delayed in any way up to January 6,1954 by the fact that Sheet 2 of the initial drawing T.O. 21.20 furnished by the Government was difficult to read or was partially illegible.
30. The contract required the plaintiff to supply wooden dunnage beams to place over the steel deck beams at the top of the towers. However, the drawing did not show any holes to be drilled in the deck beams to accommodate fastening *255 devices to secure the dunnage to the deck beams. Accordingly, from August through October of 1953, there was a dispute between the plaintiff and the engineers as to whether the contract required the plaintiff to provide means to fasten the dunnage to the deck beams. On September 3,1953, the New York Office of the Corps of Engineers wrote the plaintiff providing a suggested method for fastening the dunnage. The plaintiff’s response on September 21, 1953, was to state that this work was not covered by the contract and therefore involved an increase in the price in case it was required. In October of 1953, views were exchanged between the plaintiff and the engineers concerning the question of whether any means for dunnage fastening was required by the contract. On January 6, 1954, the matter was resolved in plaintiff’s favor, the engineers informing the plaintiff that it was agreed the contract did not require the plaintiff “to furnish a means for securing dunnage to the steel beams.”
31. On December 2, 1953, the plaintiff submitted bids for the dunnage required by the contract. The Government inspector had previously requested that action be taken to put the dunnage on order and had suggested the Hilltop Lumber Company as a possible source. The Hilltop Lumber Company submitted a bid dated J anuary 7,1954, and on J anuary 15,1954, the plaintiff wrote the Pittsburgh Office of the Corps of Engineers informing them of the type of lumber it proposed to use. On January 25, 1954, the engineers objected to the type of lumber the plaintiff proposed, and suggested another type. On February 1, 1954, the plaintiff was informed by telephone of the type of dunnage required by the engineers, and by letter dated February 5, 1954, Hilltop revised its quotation accordingly. The plaintiff placed its order for dunnage at a fixed price with Plilltop on February 15, 1954.
32. Only half of the steel deck beams would have required any additional fabrication if it had been determined that dunnage fastening was required. Any such fabrication, if required, would have consisted only of drilling holes in the dunnage and deck beams to accommodate fastening devices. After receipt of the steel deck beams in November of 1953, until the resolution of the dunnage fastening problem on *256 January 6, 1954, the plaintiff had a considerable amount of steel requiring fabrication which fabrication would not have been affected by this problem. Procurement of the dunnage itself was not dependent upon resolution of the fastening problem and it could have been procured before January 6, 1954. The type of dunnage required was determined approximately two weeks after the plaintiff formally presented this question to the engineers. The dunnage required no fabrication by the plaintiff and was shipped directly by Hilltop to the engineers in fourteen shipments commencing June 29, 1954, and ending December 2, 1954. Accordingly, there was no delay in the plaintiff’s performance which can be attributed to Government actions in the resolution of the dunnage fastening dispute or the procurement of the dun-nage required.
33. By January 19, 1954, the plaintiff had completed 41 of the 58 — 10,500 gallon towers, as well as a portion of the small components on the 21,000 gallon towers. Previously, on December 17, 1953, the plaintiff had written the Corps of Engineers advising that “Considerable fabrication has been done” and had requested that an advance or partial payment be made based upon the steel it had purchased. This request was denied by the engineers by a letter dated December 31, 1953, sent to the plaintiff. By a letter dated February 4, 1954, the plaintiff requested an extension of the delivery date due to delays allegedly caused by the Government. In this letter the plaintiff also again requested that a partial payment be granted. In reliance upon the representations as to delays made by the contractor in its February 4, 1954 letter, and without conducting an independent check to see if the plaintiff’s production was actually delayed by any actions of the Government, a findings of fact form, to sustain the insertion of a partial payment clause in the contract, was prepared by engineer employees for the signature of the contracting officer. In the findings so prepared it was stated that the contract was “* * * delayed by the Government due to lack of drawings and a decision on the dun-nage fastening problem”. These findings of fact were, however, prepared in an attempt to get the contractor out of *257 what appeared to be, upon the representations of the contractor, an unfortunate financial situation. Modifications No. 4, dated February 24, 1954, and No. 5, dated February 25, 1954, to the contract, which modifications granted the plaintiff an extension of time and partial payments, were based upon the findings of fact form, dated February 19, 1954, which form was in turn prepared in reliance upon the information provided in plaintiff’s letter of February 4, 1954. There was no delay attributable to a lack of drawings or a dunnage fastening problem.
34. Modification No. 4 dated February 24, 1954 provides as follows:
CHANGE ORDER
Requisition No. EP-5622-53 and Amendments 1 and 2
To: Vulcan Rail & Construction Company
59-30 54th Street
Maspeth 78, New York
Contract No. DA-36-109-ENG-4827
Order No. 29-6083-27
Modification No. 4
Change Order No. 4
Date: 24 February 1954
Gentlemen : Reference is made to General Provision No. 11 of your Contract No. DA-36-109-ENG-4827 dated 29 June 1953 for Towers.
It has been determined that delay in the performance of your contract was due to causes beyond your control and without your fault or negligence namely:
1. Delay by the Government to clarify method of securing dunnage to the steel beams of the towers.
2. Delay by the Government to furnish revised drawings requested by the Contractor.
Therefore, the delivery schedule for your contract is amended to: 2 August 1954.
The United States op America,
By (S) John T. Evans,
John T. Evans,

Lt. Gol., Oorps of Engineers,

Contracting Officer.

The foregoing modification of said contract is hereby accepted.
Vulcan Rail & Construction Company,
By (S) W. J. Wilson,

Vice Pres.

*258 Supplemental agreement No. 5 dated February 25, 1954 provided as follows:
SUPPLEMENTAL AGREEMENT
This Supplemental Agreement entered into this 25th day of February 1954, by and between the United States op America (hereinafter called the Government) represented by the Contracting Officer executing this agreement, and Vulcan Kail & Construction Company of the City of Maspeth in the State of New York (hereinafter called the Contractor) witnesseth that:
Whereas, on the 29th day of June 1953, the parties hereto entered into Contract No. DA-36-109-ENG-482'T for Towers and
Whereas, it is found advantageous and in the best interest of the Government to modify said contract for the following reasons:
Delay by the Government has prevented timely completion of the contract and has created a difficult inventory situation and depleted Contractor’s working capital. Contractor has requested financial assistance through partial payments.
Now, therefore, said contract is hereby modified in the following particulars, but in no others:
A. The attached clause “Partial Payments” (90%) is hereby made part of the contract in accordance with APP-7-150.1 (b) dated 15 July 1951.
B. “Examination of Records” clause hereto is made part of the contract.
All other terms and conditions of said contract as it heretofore may have been modified shall be and remain the same.
In witness whereof, the parties hereto have executed this agreement as of the day and year first above written.
The United States op America,
By (S) John T. Evans,
John T. Evans,
Lt. Gol., Corps of Engineers,

Contracting Officer.

Vulcan Rail & Construction
Company,
By (S) W. J. Wilson,
W. J. Wilson,

Vice Pres. {Title).

35. On January 15,1954, shipping instructions were issued to the plaintiff by the engineers for 39 of the 21,000 gallon *259 towers. On January 26, 1954, shipping instructions were provided for 29 of the 10,500 gallon towers and 65 of the large towers.
36. Some time shortly after January of 1954 rust under the paint was discovered by the engineer inspectors on tower components which had been completed by the plaintiff and were stored in its yard. The rust spots were scraped, wire brushed and repainted by the plaintiff. Because the steel had been received in the fall and was stored outdoors, subject to snow with freezing and thawing conditions, it was inevitable that rusting would occur prior to the time it could be fabricated. This was especially true in the industrial area in which the plaintiff’s plant was located. Because of the rusting condition of the steel to be fabricated it was difficult to clean with wire brushing. After rust appeared again on steel components which had been repainted the engineer inspector suggested that a sandblast method of cleaning the steel be employed. The engineer inspector first attempted to assist the plaintiff in acquiring a used shot blasting system which was, however, found by the plaintiff’s officials to be inadequate. The inspector then suggested the name of several companies which were equipped to handle the cleaning and painting of the steel on a subcontract basis. One name suggested was Pittsburgh-Des Moines Steel Company.
37. The plaintiff investigated the companies suggested and on May 10, 1954, invited Pittsburgh-Des Moines to quote a price for handling, blasting, painting, marking and bundling for domestic shipment the steel as fabricated by the plaintiff. Pittsburgh-Des Moines quoted a price of $443.80 for the large towers. The plaintiff on May 19,1954, awarded a contract to Pittsburgh-Des Moines for the quoted work on the large towers at the price of $443.80 per tower. After obtaining a quotation of $265 per tower for the smaller towers, the plaintiff on June 3, 1954, awarded a contract to Pittsburgh-Des Moines for grit blasting, painting, marking, bundling and loading the components for these 58 towers at the price quoted.
38. On June 15, 1954, Pittsburgh-Des Moines requested that the plaintiff complete shipments to it of the components for the smaller towers by the week of June 21. Also, Pitts *260 burgh-Des Moines asked the plaintiff if it could commence shipments of the large towers the week of June 28, 1954. The plaintiff shipped steel components for the 58 smaller towers to Pittsburgh-Des Moines in nine shipments between May 19 and June 22, 1954. One June 23,1954, the plaintiff wrote to the Pittsburgh Office, Corps of Engineers, that material had been ready for shipment to Pittsburgh-Des Moines but said shipments were being delayed due to lack of information for tags and packing lists which information was to be supplied by the Government. However, the plaintiff was able to commence shipments to Pittsburgh-Des Moines on the larger towers on June 29, 1954, the day after the date when Pittsburgh-Des Moines requested such shipments to commence. Also, the Government inspector rendered considerable assistance to the plaintiff in the preparation of the tags and packing lists required, a job which was the plaintiff’s responsibility. There was never any delay, attributable to the Government, in plaintiff’s performance of the contract relating to a lack of shipping instructions. The components for the large towers were shipped by the plaintiff to Pittsburgh-Des Moines in 29 shipments between June 29, 1954, and October 5, 1954. Instead of being delayed by the Government, the plaintiff was able to ship steel faster than Pittsburgh-Des Moines could process it.
39. A relatively small portion (approximately 10 percent) of the steel shipped by the plaintiff to Pittsburgh-Des Moines had been previously painted by the plaintiff. This painted material was, however, to receive the same surface preparation as the unpainted. Because of the nature of Pittsburgh-Des Moines’ operation, however, it did not cost any more to prepare and paint previously painted steel than it did unpainted steel.
40. After receipt of the fabricated steel from the plaintiff, Pittsburgh-Des Moines commenced its processing operation. Pittsburgh-Des Moines employed a modern automatic continuous conveyor belt operation where steel attached to the conveyor belt was first cleaned by a blaster, then a primer coat was sprayed on followed by a fast drying period in an infrared oven. The steel then proceeded into a dip tank for a first coat of paint, passed through another drying oven, *261 and received a final sprayed coat of paint followed by another period in a drying oven. Pittsburgh-Des Moines’ system for cleaning and painting steel was considerably more efficient than the wire brushing, painting, and air drying method employed by the plaintiff. If the plaintiff had continued to process the fabricated steel instead of subcontracting this work to Pittsburgh-Des Moines it would have cost the plaintiff considerably more than the sum it paid Pittsburgh-Des Moines.
41. Pittsburgh-Des Moines commenced shipping completed towers to the Government on June 23, 1954. On that date ten 10,500 gallon towers were shipped. Shipments of the 10,500 gallon towers were completed by Pittsburgh-Des Moines on July 16, 1954. On August 11, 1954, Pittsburgh-Des Moines commenced delivery of the 21,000 gallon towers and completed delivery on these units on November 29,1954, although a small order of miscellaneous parts was shipped later, on December 13, 1954. The total payment made by the plaintiff to Pittsburgh-Des Moines for the cleaning and painting, bundling, loading, etc., of the fabricated steel was $90,372.20.
42. The Government paid the plaintiff a total of $419,730 under contract No. DA-36-109-ENG-4827.
43. The plaintiff employed the accrual method of accounting and operated on the calendar year basis. Its profit and loss statements and tax returns were computed and prepared upon completed jobs so that its net income or loss was determined upon all contracts and jobs completed during the year for which the statement or tax return was made.
Under recognized accounting principles, and standard accounting practices, in order to clearly reflect and properly report the net income or loss for each year of operations, all costs applied to uncompleted jobs or contracts during the current year are classified as deferred charges, and become applicable to operating costs in the following year or years when the jobs are completed. Deferred charges on uncompleted contracts are represented by the cost of raw materials acquired for the jobs, work in process, consisting of raw materials, direct labor and all applicable overhead expense, as well as completed portions of the uncompleted *262 jobs for which, all required material, labor and overhead expense have been applied. All such costs are included in the balance sheet of the firm at the end of the year as inventories, under account classifications such as raw materials, work in process and other classifications that clearly indicate the nature of such deferred charges.
44. The final delivery under the plaintiff’s contract was made on November 29, 1954, except for some miscellaneous parts that were shipped on December 13,1954. The overall performance period of the contract was thus 518 calendar days instead of the 262 days specified from June 29, 1953, when the notice of the award was issued.
The plaintiff’s claim is based upon its overhead expense incurred during the original contract period from July 1, 1953 to March 15, 1954. There is no evidence of the plaintiff’s total overhead expense for the full year 1953 nor for 1954, nor is there any evidence of how such overhead was distributed to the contract in suit, or to any other jobs completed during these years. The plaintiff’s accountant, who had performed its audit work for some 15 years, definitely indicated that overhead was not specifically applied to each job, but that at the end of the year overhead expense was “theoretically applied” to all contracts completed during the year.
45. The plaintiff performed all fabrication work on its Government contract at its Benwood, West Virginia, plant, other than the cleaning and painting of the steel components which were subcontracted to the Pittsburgh-Des Moines Steel Company. The plaintiff’s total overhead expense during the period from July 1, 1953 to March 15, 1954, applicable to the operation of this plant, was $211,712.14. It consisted of $143,204.26 of indirect factory expense incurred or assigned to the Benwood plant, and $68,507.88 of general expense of the main office reasonably allocable to this plant.
During this period the plaintiff had completed other jobs at its Benwood plant at a cost of $550,287.24 for direct labor and materials. The plaintiff’s direct costs in the performance of its contract with the Government for labor and materials, including subcontract costs, to December, 1954, were $384,812.04. The plaintiff contends that its contract with *263 the Corps of Engineers also should 'have been completed by March 15, 1954. But its ultimate cost was reduced by $48,-461.86 as excessive costs of cleaning and painting the steel components as a result of delays and excessive rust and deterioration, which amount was included in separate claims under Counts II[1] and III. The plaintiff computed its normal direct costs at $336,350.18 ($384,812.04 minus $48,-461.86) in the performance of its contract with the Government, which should have been completed by March 15, 1954. Thus, its total direct factory costs at its Benwood plant would have been $886,637.42, with its total factory and general overhead expense of $211,712.14 representing 23.88 percents of its direct costs. By applying the 23.88 percent to direct costs of $550,287.24 for completed jobs, this would absorb $131,408.59 of such overhead costs, leaving $80,303.55 applicable to its Government contract which plaintiff claims as a loss because it was not completed and not applied.
The plaintiff further contends that if the actual costs incurred for labor and material on its Government contract up to March 15,1954, which plaintiff computed at $265,424.80, were added to the labor and material costs on completed jobs of $550,287.24 its total direct costs at its Benwood plant were $815,712.04, then the applicable overhead expense for this period of $211,712.14 would represent 25.95 percent of such direct costs. The allocable portion to completed jobs would be (25.95 percent of $550,287.24) $142,-799.54, and the remaining $68,912.60 is claimed as a loss due to delays because the contract with the Government was not completed and overhead not applied.
46. In either of the foregoing methods of allocating overhead expense, the amount allocable to the plaintiff’s Government contract would, under proper accounting, represent “deferred charges” against the contract costs whether or not it was so applied by the plaintiff. It does not represent a measure of loss due to delays or otherwise. It represents a portion of the costs along with direct material and labor that had accumulated and would be deferred and added to similar additional costs that would be required to complete the contract.
*264 47. The Benwood plant operated with an imprest fund of approximately $50,000 which was replenished from time to time. Payments at the plant were made for direct labor, freight and shipping, miscellaneous parts and shop supplies and other indirect shop expense. Most of the materials, engineering drawings, and indirect shop labor were paid for by the main office at Maspeth, Long Island, New York. The plaintiff’s direct costs in the performance of its Government contract were incurred and paid in the manner following:
Materials Labor Totals
July 1,1953 to March 15, 1954:
Main office (Maspeth)_ ;228,711.95 $254.46 $228,966.41
Benwood plant_ 15,520.59 20,843.30 36,363.89
244,232.54 21,097.76 265,330.30
March 16 to November 30,1954:
Main office (Maspeth)_ 90,372.20 90,372.20
' Benwood plant_ 9,282.79 19,826.75 29,109.54
99,654.99 19,826.75 119,481.74
Totals:
Main office_ 319,084.15 254.46 319,338.61
Benwood plant.. 24,803.38 40,670.05 65,473.43
Total direct costs., 343,887.63 40,924.61 384,812.04
During the period July 1,1958 to March 15,1954, the main office incurred indirect expense of $235,512.56, of which $102,098.95 was assigned in full of accounts or apportioned in part to the Benwood plant. The Benwood plant incurred $41,105.31 indirect expense during the same period, so that the total overhead expense for the Benwood plant was $143,-204.26.
None of the remaining general expense of the main office was assigned to either the Maspeth plant or the Baltimore plant, but it was apportioned to all three of the fabricating plants on the basis of sales during the prior three years. The Benwood plant was apportioned 51.35 percent thereof amounting to $68,507.88. The Government does not contest this apportionment.
48. Since substantially all material purchases were made by the main office, and inasmuch as the indirect expense for the Benwood plant relates largely to direct labor of the plant, the plant expense should be apportioned on the direct labor basis, and the general expense should be apportioned on *265 total factory costs, in accordance with standard accounting practices, as follows:
Direct labor Materials Totals
July 1,1953-March 15,1954:
Government contract-$21,097.76 $244,232.54 $265,330.30
other jobs completed— 180,100.68 370,186.66 550,287.24
Total direct costs_ 201,198.34 614,419.20 815,617.54
Plant overhead at 71.176% of direct labor. 143,204.26
Total factory costs_ 958,821.80
General overhead at 7.145% of factory costs. 68,507.88
Total costs for period. 1,027,329.68
Since there is no evidence furnished of the plaintiff’s plant overhead and general expense for the period of performance of its Government contract after March 15, 1954, the total approximate cost of performance is determined by projecting the foregoing rates of overhead costs upon the total direct costs as follows:
Labor Materials Totals
Direct contract costs (Finding 47)_ $40,924.61 $343,887.53 $384,812.04
Plant overhead at 71.176% of direct labor. 29,128.43
Total factory costs_ 413,940.47
General overhead at 7.145% of factory costs. 29,676.05
Total approximate contract performance costs. 443,516.52
The plaintiff was paid $419,730 for the performance of its contract and sustained a loss of approximately $23,786.52.
This loss on performance is largely attributed to costs incurred by the plaintiff in cleaning and painting parts of the steel components, which were not accepted by the Government, and all of this work had to be done again later under a subcontract for cleaning and painting of the steel components. The cost incurred by plaintiff which resulted in unsatisfactory work, with applicable overhead expense, appears as follows:
Direct labor_$11,173.21
Materials- 1,139.85
Factory expense at 71.176% of labor_ 7,952.64
Total_ 20, 265.70
General expense at 7.145% of factory costs_ 1,447.98
Total costs incurred. 21,713.68
*266 49. Tbe plaintiff claims that except for delays attributable to tbe Government, it could have completed its Government contract by March 15, 1954, without any additional increase in its overhead costs. Had the plaintiff completed its contract by March 15, 1954 and incurred the same direct costs as ultimately applied against its Government contract, its overhead expenses would have been allocable as follows:
Labor Materials Totals
Direct contract costs_ $40,924.61 $343,887.53 $384,812.04
Other completed jobs_ 180,100.68 370,186.66 550,287.24
Total direct costs.. 221,025.09 714,074.19 935,099.28
Plant overhead at 64.791% of labor_ 143,204.26
Total factory costs_ 1,078,303.54
General overhead at 6.363% of factory costs. 68,507.88
Total costs at the Benwood plant_ 1,146,811.42
The overhead allocable to its Government contract would have been reduced by $6,046.81, and its total costs would have been reduced in like amount, as follows:
Direct contract costs as above_$384, 812. 04
Plant overhead at 64.791% of direct labor_ 26, 525. 40
Total factory costs_ 411, 337. 44
General overhead at 6.353% of factory costs_ $26, 132. 27
Total contract performance costs_ 437, 469. 71
The plaintiff’s actual overhead expense allocable to its Government contract for the period ended March 15, 1954, but projected upon its total performance costs in finding 48 amounted to $58,704.48 ($29,128.43 plant and $29,576.05 general overhead). Had it completed its Government contract by March 15, 1954, its allocable overhead would have been only $52,657.67 ($26,525.40 plus $26,132.27) as above. The increased overhead on the projected performance of the contract amounted to $6,046.81.
50. Certain overhead expenses are constant and continuing whether or not production is fully attained. This is particularly true of general administration expenses. It may apply in certain types of plant or job overhead expense. However, the factory overhead normally increases or decreases in line with the flow of production, and there is no *267 proof that any specific class of factory overhead expense was increased by delays or the projected period of performance of the Government contract.
The plaintiff’s general overhead expense, as applied to the projected period of performance of the contract in finding 48 was $29,576.05. The plaintiff’s actual performance covered a period of 518 calendar days, June 29,1953 to November 29, 1954. The daily rate of general overhead costs, as projected over the entire period of performance, was $57.10 a calendar day.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and therefore its petition is dismissed.

 No proof offered under Count II.